**DAQUIN ET ALS. *vs.* COIRON.**

APPEAL FROM THE COURT OF THE FIRST DISTRICT.

.All matters of defence set up in the answer, are open to every objection of law and fact, as if these objections were specially pleaded.

A contract by which ten per cent. per annum, is to be paid for the loan of money, and two and a half per cent. for advancing it, is usurious.

And nothing but the principal can be recovered.

An original agreement to pay six per cent., may be enlarged to ten.

The vendee who has enjoyed the fruits, cannot when evicted, claim interest on the money advanced by him, and when he has not paid the purchase money, he owes interest.

An agreement to consign crops to the vendor for sale, is not cancelled by a suit for the premises, its obligations continue so long as the vendee remains in possession and makes crops.

If the thing sold be impaired in value through the neglect of the buyer, the seller is bound to the restitution of the full price—*aliter*, where the purchaser has derived profit from the waste committed by him.

The buyer has a right to rescind the sale, when the part of which he is evicted, is of such consequence, in relation to the whole, that is not to be presumed he would have bought the one, without the other.

If before eviction, part of the slaves sold, die, the loss must be borne by the purchaser.

Ordinary repairs, necessary to the enjoyment of the object sold, cannot be classed as improvements.

After a cause has been twice remanded from the Supreme Court, it cannot be sent back again to enable one of the parties to give further evidence,

The facts are fully stated in the opinion of the court, delivered by *Porter J.*

This case has been twice before the court. On the last appeal, the value of the improvements, and the fruits were examined, and decided as between the plaintiffs and defendant. The court below having failed to act on the pretensions and rights of the respective parties cited in warranty, the cause was remanded for further inquiry, and a decision on them. It now returns with a decree of the District Court, settling those rights, from which Coiron, the defendant, is appellant, and Millaudon his vendor, is appellee. Shiff and the heirs of Rochelle, who

sold to Millaudon, are also appellants from that part of the decree, which condemns them to restore to their vendee, the purchase money paid by him for the premises.

According to the decree rendered by this court when the cause was last before us, the plaintiffs before they entered into possession, were to deposite in the hands of the Clerk of the District Court, the sum of thirty-two thousand one hundred and sixty-one dollars and seventy-seven cents, with interest at five per centum on nineteen thousand five hundred and eighty-three dollars, from the thirteenth of December, 1826. Coiron, the defendant, and Millaudon his warrantor, both claimed the money, and the order to place it in deposite, was made with a view to this contest, and to preserve the rights of the party who might be ultimately entitled to it.

The judge of the First District settled the accounts of the parties, and decreed as follows :

Coiron is only entitled to recover back the part of the price of the plantation which he has paid to Millaudon,..........................................................$55,000 00

To which add interest since the institution of the suit, from the 13th of December, 1826, until the 28th of May, 1830, 3 years, 5 months, 15 days,   9,500 16

                                                           64,500 16

Millaudon in his account, shows a gross amount in his favor of.......................................................$96,497 84

From this will have to be deducted:

1st. Four instalments of the price of the plantation, which have fallen due and remain unpaid, of $5,000 each,................................$20,000 00

2. Interest on these instalments, charged,......................................... 2,130 55

3. This sum charged for depreciation in the value of the plantation,.... 20,000 00

                                              ————— 42,130 55

                                                           $54,367 29

Brought forward, ...................................$54,367 29

Millaudon is also entitled to the hire of his
negroes sold with the plantation, viz. 31 negroes,
for 2 years, 2 months; and 21 (ten having died or
disappeared) for 3 years and five months, at the
rate of $100 per annum,....................$13,875 00

Deduct from this the hire, at the
above rate, of 6 negroes of the above
number sold by Millaudon on the
11th June, 1825, 4 years,.................. 2,400 00
                                                                ——————— 11,475 00

                                                                65,842 29

Millaudon is also entitled to an allowance for
the hire and use of the cattle, plantation utensils,
&c. The aggregate value of these as estimated
by the witnesses of Millaudon, at the time of the
sale, is $3,150. $2,000 is supposed to be a rea-
sonable allowance,............................................. 2,000 00

                                                                $67,842 29
From which deduct Coiron's account,............... 64,500 16

Balance due Millaudon,................................. $3,342 13

The above balance, due to Millaudon, is based on the sup-
position that he pays the amount of the fruits decreed to the
plaintiffs, Daquin, twelve thousand one hundred and seventy-
one dollars and twenty-three cents, upon payment of which it
is ordered that he have execution against the defendant
Coiron for the above sum of three thousand three hundred
and forty-two dollars and thirteen cents. The defendant Mil-
laudon to pay the costs of suit up to the time of eviction; and
it is further ordered, that the defendant Laurent Millaudon,
recover over against the defendants, H. M. Shiff and the heirs
of Rochelle, called in warranty, the sum of thirty thousand
dollars, with legal interest on the sum of twenty-two thousand
five hundred dollars, from the thirteenth of November, 1826,

and the sum of seven thousand five hundred dollars from the first of February, 1827, until paid, and costs of suit.

The appellee, Millaudon, availing himself of the right which the law confers on parties standing in his situation before this tribunal, contends that the judgment is correct so far as it rejects the claims of the appellant, and settles his right, but that it is erroneous, in the following particulars, and should be amended.

1. That the court a quo has wrongfully allowed to the appellant, J. J. Coiron, interest upon the sum of fifty-five thousand dollars, the cash payment made by him on the plantation sold by the appellee.

2. That the court has not allowed the said appellee any thing for the neglected and dilapidated state of the premises, at the time of the trial and judgment in the court below; whereas he contends that he ought to be allowed the sum of twenty thousand dollars, therefore, according to the evidence in the case.

3. The appellant ought to be condemned to pay to the appellee, for the slaves which died, or disappeared in his service before this action was brought, estimated at five thousand and fifty dollars by the testimony.

4. The appellee ought to have been allowed the full value of the animals and plantation utensils, amounting to three thousand one hundred and fifty dollars, as appears by the evidence.

5. All the moneys decreed to be paid by the plaintiff Daquin, ought to have been expressly decreed to be paid to the appellee, as appears from the state of the accounts between the parties.

6. The court ought to have allowed ten per centum interest on all the moneys due to the appellee, according to the contract.

A great number of questions have been raised and discussed. We will take them up as nearly as possible in the order in which they were presented. The plantation was sold for one hundred and ten thousand dollars, fifty-five thousand of which were paid in obligations on third persons

not then due, and bearing interest. The other half was payable by the purchasers at certain periods mentioned in the contract. The defendant contends, that he should be allowed credit in the account, for the interest thus received by the warrantor; but for such a pretension we see not the slightest foundation. The sum received in the obligations of third parties carrying interest, must be considered as a cash payment, and if the warrantor would not be compelled to pay interest on the money had it been in his hands, he cannot be responsible for the interest which he received in consequence of that money not being in his possession.

One of the most important questions the case presents, arises out of an allegation, on the part of the defendant; that the greater portion of the balance, apparantly due by him in the plaintiffs' account, is produced by charges of interest, which are usurious. This objection is met by another, that usury was not pleaded below, and cannot be listened to on the appeal.

The pleadings in this part of the case, consist, first, of a call made on the warrantor, by the defendant, to appear and defend the action; to the answer making this demand, he annexed the contract of sale, by which he had acquired the premises, and in this contract, is contained those stipulations in regard to interest, which the defendant insists are illegal. By agreement, the cause was first tried in relation to the title, the questions as to the improvements, on the one hand, and fruits on the other, being reserved until that could be decided. After the decree of this court, sustaining the demand of the petitioners, the cause was remanded for inquiry and decision on the points reserved. On the parties going before the District Court, the warrantor called on the defendant to present his account for ameliorations, &c. He did so. To this account, he added an account current, showing what he conceived to be the true state of his transactions with the warrantor, and the balance due, and in support of several charges on the debit side of his account, he introduced three accounts which the warrantor had furnished him, and gave credit for a certain sum, which appears, though it is not so

expressed, to be the amount of the warrantor's claims against him, deducting these charges, which the appellant considered illegal. In the further progress of the cause and after a decree of this court, settling the value of the improvements between the plaintiffs and defendant, Millaudon filed another account, in which, he enters as the first item, a balance of fifty thousand eight hundred and sixty-three dollars and seventy-eight cents, and relys on the account current, introduced by the defendant, and signed in duplicate, as evidence that sum was due. The account contains several charges which are alleged to be tainted with usury. It commences too, with a balance from a former account, which contains items of the same kind. This account had also been introduced, for the purposes already mentioned, by the appellant, and it in turn referred to, and brought into it, a balance from a still earlier account, which had been received in evidence in the same manner.

All matters of defence set up in the answer, are open to every objection of law and fact, as if these objections were specially pleaded.

Now, though it is true, that usury is no where specially alleged in the pleadings below, nor is any notice taken of such a defence, in the judgment of the District Court, still we think, that under the statement just made, of the position in which the parties stood, this defence is open to the defendant here. To the call made by him on the warrantor, to maintain him in possession of the premises, or pay the damage resulting from the eviction, the latter presents an account, consisting of various items, which as he contends, shows a balance to be due by the defendant. The latter has surely the right to show error in these accounts, whether that error arises from fact or law. The position of the defendant appears to us perfectly analogous, to that of a plaintiff, against whose demand, matters were pleaded in compensation, or reconvention. Our law does not require a replication, and all matters of defence set up in the answer, are understood to be open to every objection of law and fact, as if these objections were specially pleaded. We cannot distinguish between the cases.

" The tenth clause in the contract of sale, of the premises, which the defendant purchased from the appellee, is the basis

on which the charges are made in the account current, that

are alleged to be illegal, and its influence is so important on the question raised, that it is proper to set it out at length. The following we believe, to be a correct translation.

"The three parties of the second part, will allow to the party of the first part, upon all actual advances made to them, (*avances réelles*) no matter on what head, as well as on the amount of his endorsements, a commission on two and a half per cent., to be once paid: And further, an annual interest of ten per cent. to be reckoned from the day such advances are made until that of their reimbursement, in regard to which, it will be hereafter stipulated."

By the laws of Spain, in force in Louisiana at the time this contract was made, all agreements, by which a greater rate of interest, than that allowed by law, was received or taken, were declared null and void, as to the interest so stipulated for. The appellant insists that ten per cent. was the highest rate of conventional interest permitted by our laws; that by the clause of the contract already recited, he was bound to pay more; and that it therefore falls within the prohibition just mentioned. The appellee contends, that interest and commission are distinct things, and that the limitation affixed to one, has no application to the other.

The court had no difficulty on this question, when it was raised on the argument, nor have its reflections since suggested any. The inquiry in all these cases is, were the advantages or remuneration stipulated for, in consideration of the loan of money, and are these advantages or remuneration greater than the rate of interest allowed by law? If the answer be in the affirmative, no matter by what shift or device this object is accomplished, no matter in what mode the payment is made, or by what terms it may be designated, the contract is usurious. In the instance before us, we are left in no doubt, as to the consideration on which the appellant was to pay ten per cent. interest and two and a half per cent. commission. The parties have declared in writing, that the loan of money was the cause. Words cannot change things. Ten per cent. interest and two and a half per cent. commission

A contract by which ten per cent per annum is to be paid for the loan of money, and two and a half per cent. for advancing it, is usurious.

50

EASTERN DIST.
February, 1832.

DAQUIN ET ALS.
*vs.*
COIRON.

for the advance of money for one year, is precisely the same thing as twelve and a half per cent. interest for the loan of money for one year. Where the credit is longer, it is true the equality between the two contracts is not so great, but wherever ten per cent. per annum is stipulated for interest and commission taken in addition to this interest, whether the term of payment be one year, or twenty, more than ten per cent. per annum is obtained for the loan, and this the law imperatively forbids. It is plain that the whole legislation on this subject, would be a dead letter, if on such pretexts, lenders of money could obtain a compensation for its use, greater than that they are permitted to take. In the case of *Gould* vs. *Durham*, the Court of Errors of New-York, held, that receiving more than the legal interest for the loan of money, under the name of *commission*, was an evasion of the statute against usury, and void. 16 *Johnson*, 375. It was pressed on us with earnestness and ability, that the stipulations contained in the contract, are such as usage and custom sanction. That it is the universal practice, for mercantile men to make such a charge, and that the appellee only did what he conceived he was legally authorised to do, and what any other merchant in the place would have done, under similar circumstances. We do not know that the practice is so universal as was stated from the bar, but we have every reason to believe it is very general, too general. But admitting it to be universal, what then? Does it follow, that any man, or set of men, can create a custom for their own benefit, or even for the mutual benefit of borrower or lender, and give to that custom a force, not merely of law, but to control law? Surely not. Neither combinations or usages, of the few or of the many, can control the will of the people, constitutionally expressed through their representatives, and there is no class in society, so much interested in maintaining the principle inviolate, as the wealthy portion of the community, with whom the practice in question has originated.

And nothing but the principal can be recovered.

The next inquiry is, whether the interest is reducible to the highest legal interest, or is void for the whole. The law on this subject was carefully examined, in the case of

*Sprigg* vs. *Hermann*, and we then held, that where more than the legal rate of interest was contracted for, the party lending could only recover the principal. In this case therefore, the appellees' charges for interest, arising out of the clause of the contract of sale, already stated, must be rejected; as so must all the charges made for commissions on account of advances. 3 *N. S.* 190.

EASTERN DIST.
*February,* 1832.

DAQUIN ET ALS.
*vs.*
COIRON.

But there is a stipulation in the contract of sale, for interest, which stands on different ground from that just disposed of. It is, that in relation to the failure to pay the purchase money at the periods the respective instalments fall due. By the agreement, all portions unpaid were to carry interest at the rate of six per cent., to be calculated in the form of discount. In the account current these sums are charged with interest at the rate of ten per cent. and these accounts were closed and signed by the parties. We understand this to be a convention to enlarge the interest to ten per cent., as we do not see that any thing was added in the shape of commissions or otherwise; we are of opinion the agreement was legal, and that the appellee is entitled to interest at the rate of ten per cent. on the respective instalments carried into these accounts.

An original agreement to pay six per cent. may be enlarged to ten.

Some objection was made at the bar to the right of the appellee to charge interest on these instalments from the time they became due, on the ground that the appellant has been evicted of the premises. We do not see how the eviction can affect the right to make this charge. The property is supposed to be a fair equivalent for the price. The vendee has a right to the thing, and its fruits—the vendor to the purchase money, and the interest he may derive from its use. If the price be not paid at the period contracted for, the vendor has a right to interest, for the vendee is enjoying the fruits. The eviction gives no right to demand the purchase money previously paid with interest, it of course confers none to refuse paying interest when the purchase money was withheld.

The vendee who has enjoyed the fruits, cannot when evicted, claim interest on the money advanced by him, and when he has not paid the purchase money he owes interest.

The next item in the appellees' account which is contested, relates to a charge made by him for commissions on the crops of 1827 and 1828, which he did not sell, but which by

EASTERN DIST.
February, 1832.

DAQUIN ET ALS.
vs.
COIRON.

An agreement to consign crops to the vendor for sale, is not cancelled by a suit for the premises—its obligations continue so long as the vendee remains in possession and makes crops.

If the thing sold be impaired in value through the neglect of the buyer, the seller is bound to the restitution of the full price—aliter, where the purchaser has derived profit from the waste committed by him.

the express terms of the contract of sale, the vendees contracted they would consign to him for sale. They allege in justification of their non-compliance with this agreement, the suit commenced against them for the premises; but this in our opinion is no justification so long as they continued in possession of the premises, and made crops. It was not the institution of the suit, but eviction which gave them the right to consider their contract at an end. We are therefore of opinion this item should be allowed.

The claim set up by the appellee, of twenty thousand dollars for the diminished value of the plantation at the time of eviction, and that which it possessed when sold, cannot be supported. Even if the thing sold, be impaired in value through the neglect of the buyer, the seller is bound to the restitution of the full price. It is only where the purchaser has derived profit from the waste committed by him, that the vendor has a right to claim compensation. Such are the express provisions of our code. *Page 354, arts. 55–6.*

The demand for the one-half of a note in which the parties had a great concern, the maker having become insolvent, is not supported by any evidence we can find on record, and must be rejected.

There is a portion of the property sold by the appellee, to the appellant, of which the latter has not been evicted. But he has chosen to demand a rescission of the sale of his part of the property also, and he has a right to do so, because the part of which he has been evicted is of such consequence in relation to the whole, that it is not to be presumed he could have bought the one without the other. The judge below, in settling the rights of the parties growing out of this rescission, decreed that the vendee should pay hire for the slaves, for the whole time they had been in his possession ; but we are at a loss to see on what grounds he so decided. No such consequence follows a rescission on this ground. It stands on the same footing as a rescission of the contract produced by actual eviction. The vendee has a right up to the moment of the rescission to the fruits ; the vendor to the use of the money he has received for them. But if any of the slaves

have died in the mean time, the loss must be borne by the purchaser. He could not be evicted of those that were dead. If they had all perished, he could not have claimed a rescission of the contract. They were his when they died, and *res peril domino.* It is the circumstance of their total extinction, which distinguishes this case from that where the thing exists, and is diminished in value. We cannot find any evidence on record which enables us to say what amount the warrantor should pay the appellant in case the slaves still in existence are returned to him.

EASTERN DIST.
*February,* 1832.

DAQUIN ET ALS.
*vs.*
COIRON.

The buyer has a right to rescind the sale when the part of which he is evicted, is of such consequence in relation to the whole, that it is not to be presumed he would have bought the one, without the other.

Considerable embarrassment has been felt in this part of the case, by the manner in which it was presented in argument by counsel, and the calculations and accounts they have drawn up in conformity to their views. Though the pleadings and evidence not only justify, but in some measure require such a conclusion as that just expressed. They have argued it on the basis of the whole contract being rescinded; of Millaudon, the warrantor, being compelled (if he had not already done so) to restore the whole price, as if there had been a total eviction; and that as he has thus restored the whole of the purchase money, he has a right to demand from the vendee reimbursement for that portion, of which there has been no eviction, and which has not been returned to the vendor. In this view of the case, the right of the parties would perhaps be as equitably settled, though they would certainly be reached by a quite different channel. In the hypothesis just stated, a plantation and slaves, with other accessories, is sold for a certain sum, of which fifty-five thousand dollars was paid, and twenty thousand dollars charged in account by the vendor to the vendee. If the whole of this sum be paid back, or credited on account, as for a complete eviction, and there be in truth a portion of which the vendee is not evicted, he must allow the vendor, if he retains that portion, the value of it; and he must also give credit for the portion which has perished in his hands, which could not be the subject of eviction, beause he has been paid for it, and could not have recovered for that part if he had brought an action of rescission. In this instance, the

parties have seemed to concede that the slaves in existence shall be returned to the vendor, and that the vendee shall give credit for the value of those who have perished. That value, taking a medium of the evidence offered, is three thousand six hundred dollars. To this sum must also be added two thousand one hundred and thirty-five dollars, the price of six of the slaves acquired by the appellant when he purchased the plantation. The moneys arising from the sale, have, it is true, come into the hands of the appellee, but as he gave credit for them in account, the right to demand the price of them stands on the same ground as if the money had come at once into defendant's possession.

There is also to be added to the credit of the warrantor's account, the value of cattle, oxen, and other articles delivered with the plantation of which the vendee has not been evicted, and which he has not returned. The judge of the first instance has fixed their value at two thousand dollars, and it appears to us he has not erred.

We now proceed to an examination of Coiron's account.

The first item is for the fifty-five thousand dollars, paid at the time of the purchase. For this sum he must have credit; but he is not entitled to the interest accruing on the debts he gave in payment of this sum, for the reasons already given.

The next is in relation to interest on the purchase money paid to Millaudon. We will examine this point hereafter, and proceed to the other items in the debit side of his account, which are disputed. The first and most important is that of twelve thousand and sixty-eight dollars and ninety cents for improvements made on the plantation while in his possession.

The seller is bound to reimburse to the buyer all useful improvements made by him, or to cause them to be reimbursed by the person who evicts him. *C. Code*, 354, *art.* 58.

We have examined the record for proof of these useful improvements, and although the evidence is contradictory we think it preponderates against the demand. A large number of the objects introduced in the account, and classed under this head, appear to us nothing more than the ordinary repairs necessary on all plantations to carry on the cultivation of cane

and its manufacture into sugar. Many of them such as are
required to meet the wear and tear of materials. The canals were no improvements but rather an injury than otherwise.
The levee made, and some small houses put up might perhaps be regarded as such, but there is testimony which proves the plantation on the whole has deteriorated in value since the defendant purchased it, and under these circumstances we do not think that we ought to differ from the judge below on this part of the case, who saw and heard the witnesses—and who had better opportunities than we possess, of ascertaining what credit they were entitled to.

The next item in the account is for monies paid for fees to counsel, notarial charge, &c., growing out of the purchase, and we think it should be allowed. By the 54th article of the Civil Code, p. 354, which was the law of this contract, the buyer who is evicted has a right to claim restitution from the seller, of the fruits and revenues of which he has been evicted by the owner. That amount, in this instance, was twelve thousand one hundred and seventy-one dollars and twenty-three cents, which the warrantor must pay. The vendee however insists, that although he has thus a right to the fruits, he has also a right to demand interest for the purchase money in the warrantor's hands, from the time suit was commenced. The court think otherwise. The fruits were full compensation for the interest, and we think the same principle must govern the amount of the instalments due and payable. The vendee could have been compelled to pay them notwithstanding the suit, by the vendor giving security, had objection been made on that ground. C. Code, 360, art. 65.

The District Court in its judgment directed Millaudon to pay to the Daquins, the amount of the fruits which the possessor was decreed to restore them. Had the latter restored them, or was he yet obliged to pay them, this would be correct. But by the judgment of the court, the amount of these fruits were deducted from the increased value of the land, to which increased value the warrantor is entitled. So that in fact these fruits have already been paid by him. The buyer has a

right to the price, and the fruits, but not the increased value given to the property before he bought it, all the fruits gathered by Coiron are yet in his possession, or have been enjoyed by him.

According to the calculations made by us, and the account we have drawn up, there is a balance due to Coiron of fourteen thousand four hundred and sixty-six dollars and sixty-three cents, which Millaudon, the warrantor, must pay on the defendant delivering to him the nineteen slaves yet in his possession, of which he has not been evicted.

And the plaintiffs must pay to the warrantor, L. Millaudon, the sum decreed by the former judgment of this court, viz. thirty-two thousand one hundred and sixty-one dollars and seventy-seven cents, with interest as therein expressed, before they take possession of the premises, and in case they fail to make the payment within three months from the notification of this judgment, that execution do issue against them in favor of the warrantor Millaudon.

The costs of court must be paid equally by Millaudon and his warrantor Shiff, who sold to him the one-half of the premises.

The plaintiffs have required us to modify our former judgment as it relates to them.   That cannot be done now.   The matter has passed into the authority of the thing judged.

If before eviction part of the slaves sold, die, the loss must be borne by the purchaser.

The judge below condemned Shiff and the heirs of Rochelle to pay the whole amount of the purchase money, thirty thousand dollars, with interest.   They have appealed, and their first demand in this court is to send back the case to enable them to give evidence that the judgment was erroneous. This we cannot do.   The cause was twice remanded to enable the respective warrantors to offer such evidence as was within their power, and they must blame themselves, or those who represented them, if they neglected to procure and offer their proof.

On the proof on record, however, we think the judge erred. Shiff sold the half of the plantation with forty-three slaves. Of these the defendant, or his representative, has been evicted of only a portion in nine slaves and the land.   The remaining

portion are yet in his possession or dead, and in neither case has he a right to claim their value from his warrantor.

The half of this plantation was sold for thirty thousand dollars, which is sixty thousand for the whole. Taking the forty-three slaves to be worth twenty thousand dollars, and the improvements ten thousand dollars, and the oxen, horses, &c. at two thousand dollars, the estimation given to the whole tract of land, would be twenty-eight thousand dollars. The half of this sum for which the appellants are to be responsible is fourteen thousand dollars. To which add nine shares at five hundred dollars each, and the half of this last amount added, will make the whole sixteen thousand two hundred and fifty. This result is the same as that which would be obtained by charging the warrantors in the first instance with the thirty thousand dollars, and then deducting the improvements and other objects of which the vendee has not been evicted.

It was contended, that a reference to the bill of sale, would show, that Millaudon had not sold to Coiron, the slaves which he purchased of Shiff, or at least not the whole number, for which the appellee contends. In the petition filed by the plaintiffs, they state, that a plantation and eighteen slaves, which they inherited from their ancestor, is in possession of Coiron. On the trial they prove, that thirteen of the slaves had been delivered to Coiron when he purchased, and this proof further shows, that the slaves had so many *sobriquets*, and were known by so many names, that little embarrassment remains from the designation in the different deeds, not corresponding. Millaudon sold forty to Coiron, nineteen are to be returned, six were sold, seven have died, one of which was born since Coiron took possession. There remain nine, of which he has been evicted, and for which, as already stated, he has recourse for one-half against his vendors. We think, amidst the confusion created, by the looseness with which this part of the case has been managed, that the conclusion just expressed is the safest we can come to.

The plaintiffs on recovering, were directed to pay over to the persons who had bought the premises in the first instance, or

EASTERN DIST.
February, 1832.
═══════════
DAQUIN ET ALS.
vs.
COIRON.

to those who represented them, the money which had been appropriated to the discharge of their ancestor's debts. To the one-half of that, the appellants as last called in warranty, are entitled: it is nine thousand seven hundred and ninety-one dollars and fifty cents, with interest at five per cent. from the 13th December, 1826, to the 11th March, 1830, and as it was decreed in the first instance to Millaudon, he is responsible over to the appellants. The amount including interest is eleven thousand three hundred and sixty-one dollars and sixty-three cents.

But in opposition to this, the appellee is entitled to claim the damages he has sustained by the eviction. The proof of them is on record. Millaudon bought the half of the plantation from Rochelle & Shiff, for thirty thousand dollars, payable at one, two, three and four years, and he sold it for fifty-five thousand dollars in cash, and the same sum in eleven equal annual instalments, reducing these sums into cash, at nine per cent. discount, on the deferred payments. We find, that Millaudon paid for one-half the plantation, a sum equal to twenty-three thousand two hundred and fifty dollars, and that he sold the whole for seventy-four thousand eight hundred dollars. The one-half of which is thirty-seven thousand four hundred dollars, and the difference between this last sum, and that he paid, viz : fourteen thousand one hundred and fifty dollars, is the damage he sustained by the eviction. To which add sixteen thousand two hundred and fifty dollars, the value *fixed* on the land and slaves, and we have thirty-thousand four hundred dollars, from which deduct the eleven thousand three hundred and sixty-one dollars and sixty-three cents, and the amount due, by the heirs of Rochelle and by Shiff to Millaudon, is nineteen thousand and thirty-eight dollars and thirty-seven cents. This sum, the appellee contends, they should be responsible for *in solido,* but we see no grounds to sustain this pretention. The sale of a plantation was not a commercial transaction, it was not sold by the firm of Rochelle & Shiff, but by the partners composing the firm, as joint owners.

It is, therefore, ordered, adjudged and decreed, that the plaintiffs in this action, do pay to the warrantor, Laurent Millaudon, before they take possession of the premises, the sum of thirty-two thousand one hundred and sixty-one dollars and seventy-seven cents, with interest at five per cent. on nineteen thousand five hundred and eighty-three dollars of said sum, from the 13th December, 1826, to the 11th March, 1830, and that in case they fail to do so, within three months from the notification of this decree, that execution do issue against them, in favor of said Millaudon, for the said sum of thirty-two thousand one hundred and sixty-one dollars and seventy-seven cents, with interest as already stated on nineteen thousand five hundred and eighty-three dollars of said sum.

And upon the voluntary payment, by the heirs of Daquin, of the money aforesaid, to the said Millaudon, or on the compulsory payment thereof, by execution issued against them, it is ordered, that on the defendant, J. J. Coiron, delivering to the said Laurent Millaudon, the nineteen slaves tendered on the 25th April, 1829, that the said Laurent Millaudon, pay to the said J. J. Coiron, the sum of fourteen thousand four hundred and sixty-six dollars and sixty-three cents, and that in case he fails to do so, that execution issue against him, in favor of said Coiron for the same.

And upon the payment of fourteen thousand four hundred and sixty-six dollars and sixty-three cents aforesaid, by the said Millaudon, it is ordered that he do recover of the heirs of Rochelle, and of H. M. Shiff, called in warranty, the sum of nineteen thousand and thirty-eight dollars and thirty-seven cents, one-half of said sum to be paid by each.

It is finally ordered, that the costs of this suit in the court below, be paid, one-half by Laurent Millaudon, and the other half by the heirs of Rochelle & Shiff, the costs of this appeal to be paid by the appellee, Laurent Millaudon.

Eastern Dist.
*February*, 1832.

SAME CASE.

DAQUIN ET ALS.
*vs.*
COIRON.

An original agreement to pay interest at six per cent., is not avoided by the parties subsequently entering into an usurious contract, in relation to further forbearance after the debt becomes due.

Interest does not run on the price, after suit has been instituted against the vendee for the premises.

One joint proprietor may *sell* his share to another co-proprietor, and incur the responsibility of a *vendor*.

*Porter, J.* delivered the opinion of the court.

This case presents a number and variety of conflicting interests, and the settlement of them has not been free from difficulty. One or two of the parties dissatisfied with the judgment rendered, made application for a rehearing on certain points stated by them, and their opponents finding that application would be assented to, have on their part demanded a revision of the former decree, so that the whole case may be said to be again brought under our consideration. We shall not, however, go through the entire cause, but confine our attention to these points on which the parties seem to think the court erred.

We will first take up the case of the appellee Millaudon.

We considered in our former judgment, that the pleadings authorised us to conclude, that Coiron could object to any item in the account of Millaudon, on which he could fasten the charge of usury. Our particular attention has been called to this part of the opinion, and we have again given to it, as we did before, a very careful examination.

Its correctness has been impugned principally on the ground of Coiron's answer to the call made on him to furnish an account of his claims against his vendor. This account, it is said, credits Millaudon for nearly the whole sum claimed by the latter, and makes an admission of a balance due far beyond that which would have been owing, were the deduction now claimed on account of illegal interest to take place. From the position thus assumed it is contended, that not only do the pleadings forbid an examination of the question of

usury, but that the objection was not thought of when the plea was put in.

If this view of the facts were correct, it would certainly show, that one of the principal reasons on which this court supposed the defence of usury open to the appellant, was not well founded. But it is believed by us that the facts are not such as the argument assumes. Credit is not given for the whole amount of Millaudon's account, interest included, and more, much more is excluded than these small items, which make a difference of about three thousand dollars. The difference is a great deal more, and to a sum sufficient to cover the interest. On the settlement made with Millaudon on the tenth October, 1827, the balance then stated to be due him is fifty thousand eight hundred and sixty-three dollars and seventy-five cents, after allowing credits to nearly twenty thousand dollars, in which credits are embraced the proceeds of two crops amounting to about seventeen thousand dollars. In the account filed by Coiron, credit is given to Millaudon for forty-seven thousand two hundred and thirty-four dollars and fifty-four cents; and in this same account he is charged on the debit side with the amount of the two crops, say seventeen thousand dollars, which would reduce the balance to about thirty thousand dollars, leaving out of view the other charges in the account, growing out of the eviction. We think, therefore, our former conclusions on this matter were correct, and see no ground to change them.

It is not to be expected that we should enter into an examination of the policy of laws against usury, on which the counsel for the appellee has argued somewhat at length, and with great ability. This may be a matter very proper for consideration in a legislative assembly; but courts have nothing to do with the policy of laws. Their duty is to enforce them; the wisdom and expediency of the regulation, belong to another branch of the government.

On that division of the argument, which endeavored to show that the contract in question was not usurious, a good deal was said, as if the court had established the principle that a man could not take ten per centum interest for money,

and charge a commission for other services. It was not necessary to carry the doctrine to that extent, nor have we done so. What we wished to say, and what we have decided, is that ten per centum interest cannot be taken for the use of money, and two and a half per centum commission charged for lending it, or advancing it. Because in our judgment that would be taking more than ten per centum for the loan of money. When the law enacts that nothing beyond a certain compensation shall be received for the use of money lent, its provisions cannot be evaded by the lender saying he does not charge it as interest, he demands it as commission. We are greatly deceived if any legal proposition can be more clear. No doctrine ever recognized by this court requires less aid from authority, and yet scarcely any could more readily obtain it. The courts in New-York, and in England, have established the same rule in cases which can in no respect be distinguished from that before us. And in Scotland their usury law is understood in the same way. The laws of Spain which governed Louisiana at the time of this contract, carried the doctrine still further, for they held it usurious for a man to lend money on the condition that the borrower should buy goods in the lender's store, grind corn at his mill, &c. *Curia Phillipica, lib. 2, cap. 1, verbo usura, No. 7. Bell's Commentaries, vol. 1, 310–11. 1 Campb. 177. 16 Johnson, 235.*

The next position assumed is, that according to the Spanish law, it was unlawful to take any interest at all. Consequently the forfeiture of the whole of the interest did not effect more than a reduction of the demand to what was legal, viz. the capital; but that, as by the laws of Louisiana it was always lawful to take interest for money at the rates fixed by law, by the same parity of reasoning, nothing more ought to be effected than to reduce the demand to what is legal, which is the capital and lawful conventional interest.

This argument does receive some support from the definition given in the Spanish writers, of usury, and at an early period we believe the taking of any interest for the loan of money was prohibited. The later legislation of Spain, however, places this subject on the same footing it is in other

countries, and recognizes the agreement to pay interest as binding, provided it is not above the lawful rate. *Curia Phillipica verbo intereses, lib.* 2, *cap.* 2, *No.* 32. *Partidas* 5, *tit.* 11, *law* 31, and *note of Gregorio Lopez on said law.*

It was in the last place contended, that the law reducing the obligation to the sum actually lent, and excluding the interest, was a penal statute, and as these laws have been repealed, the penalty cannot be inflicted. The principle on which this objection is made we believe correct; but it receives its application only in cases where the penalty is given to the public. The contract between the parties, takes its character, and receives its obligations from the law in force at the time it is made, and the rights acquired under it cannot be affected by a subsequent repeal of the law; for *that* would be giving to the repealing statute, a retrospective operation on a right previously acquired.

The appellee contends, he should be allowed a credit for one-half of the notes of Joseph Saul, which have been lost by bankruptcy, and refers to us a conversation between counsel at the argument by which it was admitted, that on the trial in the lower court, the necessity of giving proof of the insolvency was waved. We do recollect something being said of this matter during the argument, but neither at the time we rendered our former judgment, nor now, is our recollection of it so accurate, as to state precisely what it was. In any event, we could only reverse the judgment below, on the written acknowledgment of the parties or their counsel, that this evidence was placed before the judge of the first istance, or that an admission was made which stood in place of it.

The item in Coiron's account for counsel fees and law charges, stands on a very different footing. There is no positive evidence of the amount, but there is evidence of the litigation which has arisen out of the purchase, and law suits must necessarily produce costs and expenses. The sum allowed, we think reasonable. Where there is evidence before the court, of services rendered, for which a claim may be legally made, the value of them may be allowed on a *quantum meruit.* It is true the case is somewhat defective

EASTERN DIST. in not containing evidence of the value, and in strictness
*February*, 1832. perhaps the court cannot supply the defect. But with
DAQUIN ET ALS. the proof before us which creates a violent presumption
*vs.*
COIRON. of the justice and equity of this item in the account, we
would feel ourselves compelled to remand the cause, if we
did not admit the credit. Understanding it to be the earnest
wish of all the parties that a termination should now be
made of the case, we have taken the course as just stated, as
the means of carrying that wish into effect.

The objections made by him, to other parts of our judgment,
will be noticed when we take up the issues between him and
his vendors, cited in warranty.

The modifications of the judgment asked for by Coiron, are
next to be examined.

He complains of an error in fact in the former opinion,
where we assumed, that commissions of two and a half per
cent., had not been charged on the several instalments of the
plantation, in addition to the ten per cent. interest. We have
examined the accounts again, and we find we were in error.
We were led into it, by seeing in each account, the commis-
sions charged on the *debours* as it is called, of the appellee.
It did not at all occur to us, that money not received, could
have been placed under the head of a *disbursement.* On adding
up the accounts, however, we find it was so considered. And
the question arises, whether the account so furnised, signed
by the parties, by which the party indebted, agreed to pay ten
per cent. interest on the money due, and two and a half per
cent. commission, is such a contract as can be enforced.

On the principle already established, it is clear, it cannot;
but from this decision, another question arises. Does the
agreement to pay the usurious interest for the forbearance,
after the debt became due, annul the original contract, by
which the parties had agreed to pay six per cent. interest ? In
common law countries, and even in Scotland, where the civil
law forms the basis of their jurisprudence, it is well settled,
that an usurious agreement subsequent to the contract of loan
does not avoid the original contract if it were legal in its
inception. This rule, however, in some respects grows out
of the peculiar expressions of their statutes against this

EASTERN DIST.
*February,* 1832.

DAQUIN ET ALS.
*vs.*
COIRON.

offence, and as the decisions of their courts, principally turns on them, the general reasoning does not throw much light on the subject. The laws of Spain, so far as our researches have extended, do not furnish us with authority on the question. They state, it is true, that usury may be committed, as well after the contract, as at the time it is made, but they do not declare what effect the subsequent agreement shall have on that first entered into. The law of the Partidas, seems to contemplate the case, of the promise being made at the time the money is lent. We have given to the matter as much consideration as in our power, and we have come to the conclusion, that the first contract is not avoided, and for this reason, to which we have been unable to suggest a satisfactory answer. The original agreement to pay interest at six per cent., was valid and binding on the parties. The second as usurious, was null and void. We do not see, how the void contract can have the effect of annulling an agreement previously made, which was confessedly legal. *Pa.* 5, *tit.* 11, *law* 31. *Curia Phillipica, verbo usura, lib.* 2, *cap.* 1, *sec.* 2 *and* 3. *Bell's Commentaries, vol.* 1, 308–9. *Bacal, vol.* 7, 301.

The original agreement to pay interest at six per cent. is not avoided by the parties subsequently entering into an usurious contract, in relation to further forbearance, after the debt becomes due.

The next point on which a revision is asked is, that interest does not run on the instalments, which fell due after the suit was instituted. Our attention was not turned in the first decision, to the difference between the instalments so situated, and those which were due and payable before the suit was commenced. We considered the whole, on the right to resist payment of the interest, because there had been an eviction. We are of opinion, that interest cannot be recovered on these sums, which became due after the defendant was disturbed in his possession. The case comes entirely within the principle already decided, in that of *Jiovellina* vs. *Minor,* 1 *Louisiana Reports,* 72. The vendor had no right to ask for payment, until he tendered security; and until that was done, the vendee was not in default for not paying. Nor in our judgment, were the obligations of the parties at all changed in this respect by the fact alleged, that, at that time, the buyer owed the seller on other accounts. That debt, as the

Interest does not run on the price, after suit has been instituted against the vendee for the premises.

52

result of this case shows, was entirely contingent on the event of eviction.

The next matter to which our attention has been drawn is, the decretal part of the judgment. We decreed, that Millaudon, the warrantor, should receive the sum which the plantiffs were directed to pay before they could enter into possession, and that on their failure to do so, the former might issue execution against them. On the payment of this sum, either voluntarily or by being forced, that Coiron should have recourse on his warrantor, for the amount due to him. It is objected that Coiron should not be compelled to surrender the property before he is satisfied this amount, and that the warrantor may never be compelled to pay. This is certainly possible, though from what has occured, there is not much probability of the event taking place. It is a contingency, however, to which all cases of this kind are liable. If the rights of the parties, were to be settled on the mere eviction of the plaintiffs, the judgment could be easily modified to meet the views of all concerned, but there has been another matter mixed up in the suit, which creates considerable embarrassment in our doing so. In addition to the property of which the defendant was evicted, there were nineteen slaves sold to him, to which the Daquins set up no title. For these he has claimed a rescission of the sale, and it has been allowed, and they make a part of the consideration of the money which Millaudon is directed to pay. Under these circumstances, we think, their delivery should be a condition precedent to the payment, and that our former judgment in this respect is correct. It is suggested, that some of the slaves have died since the tender made, and that obstacles may be thrown in the way of the recovery of the money on that ground. We should hope not. There is, however, no proof before us of their death, and we can pronounce no opinion respecting the effect the tender produced. Still it is proper the judgment should be modified to meet a contingency, which in the nature of things is possible, and instead of being peremptory, that the slaves be returned, it must be, that they be returned, or legal cause be shown why they are not returned. We see

the difficulty to which this may give rise, we lament it, but we cannot remedy it. The want of proof, prevents us from making such a decree, as it would effectually close the door against further litigation.

We do not see that any error was committed in regard to the medium value of the other slaves. The calculation submitted to us to prove the mistake, assumes that seven of them died. The testimony offered by the defendant himself, shows that eight were deceased.

In regard to the claim for improvements, the argument has produced no change in our opinion, and we leave it on the reasons already adduced by the court.

There seems no dispute about Romain's note, and the judgment must embrace it.

There remains for examination, the matters in dispute between Millaudon and Rochelle & Shiff, his vendors.

The correctness of the judgment heretofore rendered, has been controverted on two grounds—one of law, and the other of fact.

The vendors and vendee were joint proprietors of the property at the time the purchase was made, and it is argued that their obligations in this contract are to be governed by the rules established in our code, relative to partitions between co-heirs. According to these provisions it is contended, the right of the co-heir, in case of eviction, is limited to the value of the object at the time of the partition. If this position be ·correct, the court erred in considering the warrantors responsible for the increased value of the property.

It has been very ably supported. The grounds on which the argument rests are : That the parties to the sale being at the time it was made joint owners, the act can be considered in no other light than a partition by which their joint property in it was severed, and that the form in which this partition was made, cannot change the nature of the transaction. The Civil Code is cited to show, that when the partition is difficult it may be made by cant or licitation, and adjudicated to one of the heirs or partners; or that, if they are of age, the uci-

tation may be made amicably.    *Civil Code*, 188, *arts.* 174–5, 171–2.

In this hypothesis it is further urged, that heirs in case of eviction are only bound for the value of the property at the time the division takes place.    It being a fundamental principle in matters of this kind, that the condition of the heirs should be the same, a principle which would be entirely violated in a case where the lot given to one of the heirs rises much in value before the eviction.    As his recourse in warranty might be for a much greater amount than the value of all the lots originally partaken.    The Civil Code, which was only a digest of the laws in force at the time it was made, declares that each of the co-heirs is personally bound in proportion to his hereditary share to indemnify his co-heirs for *the loss* which the eviction occasions, and reference is made to French, Spanish and Roman law, to prove that this loss is considered to be the value of the lot at the time of the partition.    *Civil Code*, 204, 240.    *Pothier Contract de vente, no.* 632.    *Febrero, p.* 2. *lib.* 2. *cap.* 9, § 2, *no.* 20.    *Ajora de Partionibus, par.* 3, *quest.* 9, *no.* 19, 22 *Digest lib. tit.*

This is an imperfect summary of the argument.    Before presenting our view of the case, it will be well to set out that part of the contract by which the parties transferred on the one hand, and acquired on the other, the plantation and slaves. The deed of sale commences as follows: "*Furent présens Messieurs Reuben Louis Rochelle et Hart Moses Shiff négocians associés demeurant en cette ville.    Lesquels déclarent vendre, céder, et transporter, comme de fait, et à titre indivis ils vendent, cèdent, et transportent, par ces présentes, dès maintenant et à toujours, avec promesse de garantir, de tous troubles, évictions et de tous autres empêchmens quelconques de toute nature et à quelque titre ce soit, comme aussi de toutes dettes et hypothèques.    A. &c.*"

In a subsequent part of the contract, it is stated that the sale is made for the sum of thirty thousand dollars, at one, two, three and four years credit.

If we were to consider this act as one of partition, and governed by all the rules applicable to the division of estates

between co-heirs, a question would arise on which this court would have difficulty in coming to a conclusion satisfactory to itself. By the French and Spanish laws, the heir in case of eviction could not claim from his co-heir the increased value of the property. According to our code each heir is personally bound to indemnify his co-heir for the loss which the eviction has caused him. *Toullier* and *Grenier*, are of opinion the article of the Napoleon Code, from which ours is a copy, has changed their former jurisprudence. Other writers think differently. We do not discover that the case has yet received a judicial determination from the Court of Cassation. Equity in many cases would be greatly violated by such a rule, but the letter of the provision certainly sustains the opinion of the writers just mentioned; for if the property be worth a given sum, say ten thousand dollars, at the time of eviction, that is the amount of the loss the heir sustains, though he may have received it for one thousand dollars.

But the present case does not require us to express an opinion on the question, and we proceed to examine it on the other point made in argument.

We have already set out those parts of the act by which one of the co-proprietors acquired the right to the whole. From the expressions there used, it appears one of the parties assumed the character of vendor, and the other that of vendee, and there is nothing which indicates their intention to make a partition, but much to induce the belief they intended to sell on the one side, and buy on the other. Still, no matter how strong that intention was, if it be true that all acts between co-proprietors, which put an end to joint ownership, are to be governed by the laws regulating partitions, then the clauses of warranty in the deed must be construed in relation to these laws.

It seems very difficult, if not impossible, to assign any good reason, why one joint owner should not have the right to sell his share to the party who owns the thing in common with him, and why he might not sell it on such clauses and conditions as they both choose to agree on. If they have the power to do so, it seems almost as difficult to say why, when

they do pass a contract of sale, it should be presumed they did not intend to do what they expressly say they do; but that their act is to be regarded as one of partition, and not of sale.

And yet such was the jurisprudence of France previous to the adoption of the Napoleon Code. Pothier tells us, their law on this subject differed widely from the Roman. By the the latter, the parties to a partition were considered in the light of those who made an exchange, and each was understood to convey to the other his title to the lot assigned. In the French law, however, an entirely different principle governed the partition of co-heirs. They were not considered as acquiring from each other, but as indicating the portion which each was to take on the title descending from the common ancestor. This rule was extended to cases where one heir gave up his right in the property for a sum of money, or even where one purchased out the pretensions or claims of all his co-heirs in the succession. The heir who thus acquired, was not understood to obtain either right or title from the co-heir, but as taking that to which he had a title from the moment of the ancestor's death. Hence a mortgage in favor of the creditors of the heirs who transferred to another, for a sum of money or any other valuable consideration, their share of the estate, had no effect on the property so transferred. The law considered they never had any title to it; that it had belonged to the heir who acquired it from them ever since the death of the common ancestor.

One joint proprietor may *sell* his share to another co-proprietor, and incur the responsibility of a *vendor*.
The principle was pushed further, and the same author informs us, that if one co-proprietor sell a piece of property to the individual with whom he held it in common, by an act containing all the clauses of the contract of sale, still it is not a sale. It would seem, he says, there could be no doubt it should be considered such, but the jurisprudence of the country holds it for a fixed maxim that it is an act equivalent to a partition, by which the vendee acquires no title from the vendor, but is considered as holding under the person from whom they both purchased; and as having held the whole

under him, even during the time the right was shared by a joint owner. *Pothier traite de vente*, 637 *to* 644 *inclusive.*

If this was the rule prevailing in Louisiana when this act was passed, it would be nearly decisive of the present case, but we do not think it was the rule. The laws of Spain, then unrepealed, on this subject followed those of Rome, and perhaps went farther. So far from considering it impracticable for one co-proprietor to sell to another, they in express terms establish his right to do so. By the 55*th law, of the* 5*th title, of the* 5*th Partidas,* it is declared that where two or more persons possess any thing in common, we say that each may sell his part, though the thing be not divided, either to one of his co-proprietors, or to a stranger. We find this law under that division of the Partidas which treats of those who may buy and sell. We see by the terms of it, that a joint owner may sell to another as he might to a stranger. We see no difference in the obligations imposed by such a sale, and that to any other person ; and hence we conclude, that as he might lawfully sell to his co-proprietor, he might sell to him with all the clauses and conditions which were lawful in a sale to a third party.

When we add to these reflections, the considerations which arise from the law of the *Recopilacion,* which enacts, that in whatever form a man chooses to bind himself, he shall be bound; we are unable to resist the belief that in Spain a contract like this before us, could produce the same effect as a a sale between persons who did not hold the property in common.

The next inquiry is, whether this law has been repealed by the enactment in our Civil Code relative to partitions.

We think not. It is true the 253d article of that work, page 206, says, that all acts which tend to the division of property are subject to rescission for lesion of one-fourth, whether they be entitled by sale, exchange or otherwise ; but this rule does not prevent one co-proprietor selling to another. It only furnishes conditions which must not be violated if he does so, and with this exception the parties may make any

contract they choose in respect to the thing held in common. *Chesneau's heirs ads. Goodwin,* 3 *N. S.* 409.

Our conclusion on the whole matter is, that the appellants took on themselves the character, and incurred the obligations of vendors, and we do believe this construction of the instrument gives full effect to the intention of the parties at the time they executed it.

As to the value of the improvements on the land at the time of the sale, we have again examined the evidence, and we think the calculation of the appellants' counsel is correct. We shall estimate them at seventeen thousand one hundred and fifty dollars.

The appellee complains we have reduced the credit sale of the plantation into cash, at two high a rate of discount. The rate is high, perhaps too high, to be sanctioned in the loan of money, where the obligations would not be due for many years, but in estimating damages, in a case of this kind, we think it does justice between the parties. Sugar plantations were formerly sold in Louisiana on a long credit, at a price far above the cash price, and ten per cent. interest, for the same space of time. We do not believe the appellee could have sold the plantation for more in cash, than the sum to which it is reduced, by deducting nine per cent. on the deferred payments.

The first payment was not due in one year, but in eighteen months and a half, and so throughout the others. The cash price was seventy-seven thousand six hundred and twenty dollars, reducing it at nine per cent., and taking the term of payment from the 16th October, 1824, to the last April, 1826.

Millaudon must be credited with one-half the value of the fruits of which Coiron was evicted by the plaintiffs, and for which he, Millaudon, has been made responsible. For this sum, Rochelle & Shiff are responsible, as vendors of one-half of the plantation.

The modifications now made in the former opinion of the court, require a change in the judgment.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be annulled, avoided and reversed ; and it is further ordered, adjudged and decreed, that the plaintiffs in this action, do pay to the warrantor, Laurent Millaudon, before they take possession of the premises, the sum of thirty-two thousand one hundred and sixty one dollars and seventy-seven cents, with interest at five per cent. on nineteen thousand five hundred and eighty-three dollars of said sum, from the 13th December, 1826, to the 11th March, 1830, and that in case they fail to do so, within three months from the notification of this decree, that execution do issue against them, in favor of said Millaudon, for the said sum of thirty-two thousand one hundred and sixty-one dollars and seventy-seven cents, with interest as already stated, on nineteen thousand five hundred and eighty-three dollars of said sum.

And upon the voluntary payment, by the heirs of Daquin, of the money aforesaid, to the said Millaudon, or on the compulsory payment thereof, by execution issued against them, it is ordered, that on the defendant, J. J. Coiron, delivering to the said Laurent Millaudon, the nineteen slaves, tendered on the 25th April, 1829, or showing good cause to the Court of the First District, why they are not delivered, that the said Laurent Millaudon, pay to the said J. J. Coiron, the sum of fifteen thousand two hundred and sixty-seven dollars and eighty-three cents, and that in case he fails to do so, that execution issue against him, for said sum, in favor of said Coiron :  Provided, however, and it is so ordered, that the said Laurent Millaudon, before taking out execution, do surrender to the said J. J. Coiron the note of Romain, for one hundred and one dollars and seventy-eight cents.

And upon the payment of the said sum of fifteen thousand two hundred and sixty-seven dollars and eighty-three cents by the said Millaudon, to the said Coiron, it is ordered, that he, Millaudon, recover from the heirs of Rochelle and of H. M. Shiff, called in warranty, the sum of twenty-two thousand nine hundred and fifty nine dollars and thirty-one cents, one-half of said sum, to be paid by each.

53

It is finally ordered, that the costs of this suit in the court below, be paid, one-half by Laurent Millaudon, and the other half by the heirs of Rochelle & Shiff, the costs of the appeal to be paid by the appellee, Laurent Millaudon.