SimoN, J.
This controversy arises out of certain oppositions made by divers judgment creditors of the insolvent, to an account, or provisional tableau of distribution filed by the syndic, which contains a statement of a special account rendered of the sum of $25,000, mentioned in said account as being in the hands of John Hagan to the credit of Barrett’s estate, and partly distributed by allowing $2175 thereof to Sylvain Peyroux, or his assignees.
The opponents, to wit, The Union Bank of Louisiana, Christopher Adams, Isaac T. Preston, Thomas Wilson & Co., and Joseph V. Labarre, representing themselves to be judgment creditors of the insolvent for very large amounts, by virtue of judgments duly rendered against him, and regularly recorded in the office of the Recorder of Mortgages some time anterior to the declaration of insolvency, claim to be paid in preference to Sylvain Pey-roux, or his assignees, out of the proceeds of certain lands situated in the rear of the city of New Orleans, and in the parish of Pointe Coupée, in the title to which, though in the name of John Hagan, the insolvent had an undivided interest which he surrendered to his creditors. They deny the right of preference allowed to Sylvain Peyroux, pray that said [account or tableau may be amended, so as to reject Peyroux’s claim, and place the oppo *475 nents thereon according to the rank of their judicial mortgages as determined by the dates of the inscriptions of their judgments.
The Judge, a quo, rendered judgment against the opponents, overruling their oppositions and homologating the account filed, from which they took this appeal.
The facts of the case are these: It appears from the correspondence between John Hagan and Thomas Barrett that, as early as 1833, they intended to purchase jointly from the heirs of General Lafayette, certain tracts of land situated in Louisiana, in the rear of the city of New Orleans, and in the parish of Pointe Coupee. In a letter dated at Dublin, 18th of October, 1833, John Hagan writes to Barrett: “ The enclosed document will show that 1 have not neglected your wishes respecting the purchase from Sir J. Coghill, which when satisfied, you will consider for our joint accounts. I think the arrangement a very good and safe one for us,” &c. In another letter dated at Liverpool, August 16th, 1S36, John Hagan writes to Barrett: “ 1 have been anxiously waiting for an answer to my letter from Paris on the subject of the Lafayette purchase ; however, from subsequent conversations with Geo. Lafayette, I do not think he is inclined to sell. I shall see him next month, and get his power of attorney to sell or divide the property, as I think it better for all our interests that either one or the other should be done, fyc.” In a subsequent letter, dated at Liverpool, September 27, 1836, John Hagan says : “ 1 am much disappointed, at not hearing from you on the subject of the Lafayette property. Mr. McCready is here, and says he came to Europe on purpose to have the titles made valid, that we may have no difficulty in conveying the property hereafter, Spc.” He further writes: “ When in Paris, a short time since, I purchased out the interests of the two sisters of Geo. Lafayette, say two-ninths at 50,000for each, one-ninth payable either in Neiv Orleans, on receipt of the deeds of sale, or in Paris prior to the 1st of May next, 6pc. Geo. Lafayette would not sell his interest, but will forward a power of attorney, to join us in a sale or division of the property, &c.” In divers other letters written subsequently, John Hagan gives Barrett information in relation to the purchase, and to the titles from Ooghill and Lafayette ; and, in a letter dated at New Or *476 leans, 27th April, 1837, John Hagan, finally says: “ In consideration of the sum of three thousand pounds sterling, I hereby acknowledge that you are half interested with me in the purchase of the Lafayette lands near the city and in the parish of Pointe Coupee, agreeably to the titles derived from Sir J E. Coghill, and now in my name. I also agree to convey to you for the sum of $10,000, one-half of my interest in the purchase made from the heirs of the late Gen. Lafayette at Paris, say two-ninths of the property near the city, when my titles to the same are confirmed.”
On the 11th of May, 1840, Barrett made a surrender of his property to his creditors; and among the property thus surrendered, he carried in his schedule, his interest in the Lafayette property in New Orleans and at Pointe Ooupée, estimated at $250,000, which, he states, is subject to judicial mortgages.
The evidence further shows, that the recording of the opponents’ judgments was anterior to the failure of Thomas Barrett ; that, by notarial acts passed in November, 1838, and March, 1839, certain mortgages were executed by the insolvent in favor of Sylvain Peyroux, on divers pieces of real property and slaves, to secure a very large amount of endorsements furnished, or to be furnished, by the said Peyroux, for the benefit of Thomas Barrett, and that S. Peyroux appeared at the meeting of the insolvent’s creditors; made a declaration under oath, of the sums due to him, and accepted the surrender of the property, without making any objection or reservation as to the statements carried in the schedule, or upon any other subject.
But it further appears (and this is the foundation of Peyroux’s claim of preference,) that a certain act under private signature, purporting to have been executed by John Plagan on the 27th of April, 1837, was recorded on the 17lh of May, 1842, in the words following, to wit: “ Thomas Barrett, having an interest with me of two-thirds of the property in the rear of the city of New Orleans, being the property known as the Lafayette Grant, or on ZimpeVs plan as 1 Suburb Hagan? and also a further interest in said property of one-half of eight-ninths purchased of the heirs of Lafayette and paid for by Lewis Rogers, in consideration of which he became interested xoith Thomas Bar- *477 ret and myself, to the extent of one-fifteenth of our eight-ninths ; the remainder is owned jointly by myself and Thomas Barrett, as well as a tract of land in the parish of Points Coupee, containing about 4000 acres, (all of these being purchases made by me of Sir Joshua E. Coghill and the heirs of Gen. Lafayette,) 1 hereby bind myself to pay over to Sylvain Peyroux, Esq., the proceeds of the sale of said lands, as far as the interest of T. Barrett is concerned, after deducting therefrom the amount of my advances for account of said Thomas Barrett, as well as a guaranty given to Lewis Rogers for $40,000, provided his fifteenth interest does not bring that amount. The property to be disposed of at public or private sale prior to the 1st of May, 1841. New Orleans, April 27th, 1837, John Hagan?
In addition to this evidence, certain testimony has been produced to show the real date of the act under private signature, which is proved to be in the hand-writing of one of the witnesses, who recognized it to have been written under the directions of Thomas Barrett, and signed by John Hagan on the day next after its date, and to have been delivered to Sylvain Peyroux on the same day, in the presence of said Barrett. The parol proof goes also to establish the reality of the debt due to Peyroux, the different payments made by him of divers notes which he had endorsed for the insolvent at different periods, beginning in the early part of the year 1838, and the repeated renewals of Barrett’s notes, endorsed by Peyroux, and finally taken up by the latter at different times before and after the insolvency.
Under the issues presented by the pleadings, and the evidence adduced by the parties in support of their respective pretensions, it is clear, that their rights depend upon the solution of two questions : 1. Did Thomas Barrett ever acquire such a title to his interest in the Lafayette lands, as to subject his portion to the effect of the judicial mortgages recorded against him, and to enable him to surrender it to his creditors ?
2. What is the extent and effect of the act under private signature executed by John Hagan, at the request of Thomas Barrett, in favor of S. Peyroux 7
I. It cannot be controverted that the object of John Hagan, as by him expressed in his letters, from the origin of the speculation, *478 was, that the purchase of the Lafayette lands should be made for the joint concern and benefit of himself and Thomas Barrett; indeed his correspondence with the latter,shows that he was acting in the transaction as his agent, or negotiorum gestor, and that the title to the property intended to be acquired, was to be for their joint account. It it true, the business was carried on in the name of John Hagan; but the interest of the latter was limited to the portion pointed out in his letters, and it is obvious that the ownership of the lands, from the moment that John Hagan acquired his title thereto, was common to both himself and his partner, for whom he had acted, and with whose money the property had been.paid for. This, Hagan fully acknowledged in his letter of the 27th of April, 1837, (of even date with the act under private signature, but anterior to the signing of the latter,) which recognizes a good and valuable consideration, (£3000 sterling,) and the extent of Barrett’s interest in the purchase of the Lafayette lands, agreeably to the titles derived from Sir J. E. Ooghill and then, in his, Hagan's name ; and amounts also to a promise of sale for the sum of $10,000, of one-half of his, Hagan’s, interest in the purchase made from the heirs of General Lafayette.
Now, it is one of the first principles of law, on the subject of sales, that a contract of that kind is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object, and for the price thereof, although the object had not yet been delivered, nor the payment made. Giv. Code, art. 2431. The property is of right acquired to the purchaser, that is to say, the ownership of the thing sold, which is the right by which it belongs to some one in particular, to the exclusion of all other persons ; (Civ. Code, art. 480 ;) and a promise to sell amounts to a sale, where there exists a .reciprocal consent of both parties, as to the thing and the price thereof. Civ. Code, art. 2437. The only formality that the law requires between the parties is, that a sale of immoveable property should be made in writing; (Civ. Code, art. 2415;) but the contract is perfect when three circumstances concur, to wit, the thing sold, the price, and the consent. Civ. Code, art. 2414. So, in 3 Mart. N. S. 337, this court held, that a receipt of a vendor, acknowledging *479 payment by vendee of a lot of ground, is a good and valid sale. In 1 La. 314, we said, that evidence of the receipt of a sum of money for a slave, and the promise to warrant the title, is a sufficient evidence of a sale, and that the document lohich contains evidence of these two facts, is a bill of sale■ In 2 La. 460, we declared, that a written promise to sell or convey real property is valid, notwithstanding there be no signing or written assent by the promissee. In 3 La. 397, we held, that a contract by which one joint proprietor conveys all his interest in common property to another, for a given sum, is a sale. And in the case of Long v. French, 13 La. 231, we recognized the doctrine that an agreement to sell a lot of ground, in which it is designated, and the price and terms of payment specified, is a specimen according to art. 2431 of the Civ. Code, and the seller is bound to execute a title accordingly. Thus, it seems clear, that the essential requisites for the perfection of a legal contract of sale exist, and that the written acknowledgment and agreement of Hagan is, at least between the parties, a good title in favor of Barrett, and sufficient to transfer to him the ownership of his interest in the Lafayette lands. If so, his portion could be validly mortgaged, or made subject to the legal effect of judicial mortgages recorded against him, and his rights to the property so acquired, must have passed to his creditors by the surrender made thereof in May, 1840.
II. This act, which recognizes in its fullest extent the title of Thomas Barrett, and absolute ownership in him to the property therein described, is relied on as amounting at least to a transfer of the proceeds of the property which John Hagan was authorized to dispose of at a public or private sale, and the title to which, it has been urged, had always remained in the latter. It may have been executed with the knowledge and assent of Barrett, who, at that time, may have consented, (though the parol evidence of the fact is perhaps objectionable,) in contemplation of the sale of the property, that the proceeds of his portion should pass through the hands of Sylvain Peyroux, for certain purposes which are not expressed in the act; but how can it be contended that it is sufficient to vest Peyroux with the right of claiming said proceeds for his special benefit, and as his, when it is shown that *480 the property, not having been sold or disposed of before the failure, was subsequently surrendered by the owner thereof to his creditors. The authority of John Hagan to sell it had ceased; the title thereto became vested in the insolvent’s creditors, who had, from, the moment of the opening of the insolvency, acquired the right of dividing its proceeds between themselves according to the rank of their respective claims; and it seems that Peyroux himself considered it so, since he appeared at the meeting of the creditors, and accepted the surrender, such as it was, under the schedule, although the act which he now seeks to avail himself of, was then in his possession, had never been recorded, and was unknown to Barrett’s creditors.
It has been conceded by the appellee’s counsel, that the act under consideration is neither a pledge, nor a mortgage, nor a sale ; but he has insisted, that the right of his client is indisputable, by virtue thereof, to claim the proceeds of the sale of the property, as his, under the transfer made to him, with the assent of Barrett, whose title to the lands was only inchoate and imperfect. Those proceeds were not in existence at the time of the act, and nothing shows that, if it was intended to be a transfer thereof to take effect at any subsequent period, any consideration was paid or given for it; none is stipulated in the instrument; and, indeed, we cannot infer from the evidence, that Barrett Was then indebted to Peyroux in any such amount, as might be considered as a good and valuable consideration therefor. The testimony establishes the fact, that the latter had not endorsed for Barrett until nearly a year after. Two of the witnesses state, that Peyroux’s endorsements first began about January, 1838, and the record shows, that in order to secure those endorsements, mortgages were executed by the insolvent in favor of Peyroux, in November, 1838, and March, 1839, corresponding exactly with the dates of the notes, and of their subsequent renewals. Hagan bound himself to pay the proceeds of the sale of Barrett’s property to Peyroux, and nothing proves that at that time, Barrett owed anything to the promissee ; the lands had not been sold ; ■they were then the property of Barrett in common with Hagan; and whether Barrett assented to their proceeds being paid over to Peyroux or not, in the expectation of a sale thereof being subse *481 quently effected, is immaterial, as we cannot at most view the act relied on in any other light, but as a mere Voluntary mandate 01* power of attorney, on the part of Barrett, (who is not even a party to the act, and whose assent thereto is only proven aliunde>) authorizing Hagan to sell his undivided half of the property, and pay the proceeds to Peyroux, and empowering the latter to receive them, either as agent of the owner, or for purposes which have not been shown, and are not expressed in the instrument j and surely, such a mandate was revoked by the cessio honorum, subsequently made by Barrett to his creditors. The fact that the act was recorded two years after the failure, cannot have any legal bearing on the rights of the parties, as it had ceased to have any effect, from the day of the declaration'of insolvency; and as the mortgage rights which third persons had acquired upon the property, by virtue of the recording of their judgments, could not thereby be in any manner affected. We are of opinion, that the proceeds in controversy do not belong to Peyroux, who never had any legal right or title thereto in himself; and that they ought to be distributed between the insolvent’s creditors according to their rank.
Denis and Preston, for the appellants.
L. C. Duncan and Roselius, contra.
It is, therefore, ordered and decreed, that the judgment of the Parish Court be annulled and reversed ; that the appellants’ oppositions be sustained; and that the provisional tableau to which they were made, be so amended as to divide the sum in controversy between the opponents, according to the rank of their claims, based upon the dates of their judicial mortgages operating upon the property from which said sum has proceeded; and that this cause be remanded to the court, a qua, for that purpose ; the appellee paying the costs of this appeal, and those of the oppositions in the lower court*

 Roselius, for a re-hearing. The decision of this case, as the court observes, depends on the solution of two questions:
1. Did Thomas Barrett ever acquire such a title to his interest in the Lafayette lands, as to subject his portion to the effect of the judicial mortgages reoorded against him ; and to enable him to surrender it to his creditors'! *482 2. What is the extent and effect of the act, under private signature, executed by John Hagan, at the request of Thomas Barrett, in favor of Syivain Peyroux ?
I. Whatever may have been the intention of Hagan and Barrett, in relation to the acquisition of the property which has given rise to this controversy, it cannot be contended, that the statements made by the former, in his letters to the latter, can be considered as vesting a title in Barrett. The only foundation for Barrett’s title, is the tetter dated New Orleans, 27th April, 1837. There is no doubt, that as between the parties, this is sufficient evidence of title in Barrett to the property purchased by Hagan of J. E. Coghill. But it is equally clear, that as regards the two-thirds of the laud bought of the heirs of 'Lafayette, no title whatever was transferred to Barrett. With respect to this part of the property, it cannot be viewed in any other light, than as a mere proposal to sell, or pollicitation, and depending on an uncertain event, i. c. the confirmation of Hagan’s titles. Nothing shows that Barrett ever assented to the proposition ; nor is there a shadow of proof, that he paid or even agreed to pay, the price for which Hagan offered to sell it. It therefore does not constitute even a promise to sell, so as to affect the. title ; for there existed no reciprocal consent of loth parties, as to the thing and the price. There was no mutuality of obligation, for Hagan could not have compelled Barrett to pay the price ; and it is clear, that in synallagmatic contracts, both parties must be equally hound to comply with the obligations imposed on' them. The judicial mortgages on which the claims .of the opponents are founded, could not, consequently, operate on the property purchased by Hagan of the heirs of Bafayette. It has already been seen, that the only evidence of title in Barrett, to that part of the property acquired by Hagan of J. E. Coghill, is found in the letter dated New Orleans, 27th of April, 1837. This letter was never recorded, and can produce, of course, no effect, except as between the parties. But on the same date Hagan, at the instance of Barrett, executed the act under private signature, in favor of Syi-vain Peyroux. As there is no evidence to show whether the letter or the act under private signature, was written first, they must be considered as simultaneous acts. [There is evidence showing which was written first. The parol evidence proves that the act under private signature, was signed by Hagan on the day next after its date, — thus, the letter was written first, and the title had passed. Simon, J.] And the question now arises, was there any necessity to record the act under private signature '1 If the evidence of Barrett’s title had been recorded, it might well have been contended, that the transfer in favor of Peyroux could produce no legal effect against the creditors of Barrett, until it was likewise made public by being registered in the conveyance office. But inasmuch as loth these acts hear the same date, and as it is not shown that the title was in Barrett, for a single moment of time, it is difficult to see how the opponents’ judicial mortgages, could attach to the property in Barrett’s hands. The second question, whether Barrett could surrender the property to liis creditors, depends for its solution on the legal effect of the act under private signature in favor of Peyroux; for if that divested Barrett of his title, it would he idle to pretend that he could transfer it to his creditors.
II. The validity of the act under private signature is contested principally on the ground, that the consideration of the transfer is not mentioned. It is true, that the act is loosely drawn up ; but it does not follow that a conveyance must be void, because the consideration is not sot forth. On the contrary, even in the case where *483 a false consideration is mentioned in the act, it is still binding on the parties, if a real consideration be proved. The 1894th article of the Code is very explicit on this subject. It is as follows: “ If the cause expressed in the consideration should he one that does not exist, yet the contract cannot be invalidated, if the party can show the existence of a true and sufficient consideration.”
And in the case of the Louisiana College v. Keller, 10 La. 164, this court decided, that “ an obligation is not the less binding, though its consideration or cause is not expressed.” In the ease now under consideration, the evidence abundantly establishes the consideration which Peyroux paid, for the transfer of Barrett’s right to one-half of the proceeds of the sale of the property. It is objected, however, that the consideration was not paid, at the time the transfer was made. The intention of the parties evidently was to seeure Peyroux against the liabilities which he was about to incur, by his endorsing Barrett’s paper. Under this state of facts, the question is, whether such a transfer ean legally be made, for the purpose of indemnifying a party for prospective endorsements ? It is of little importance, so far as the decision of this question is concerned, whether the endorsements preceded the transfer, or were given afterwards. The Code provides in express terms, article 3259, that “ a mortgage may be given for an obligation which has not yet risen into existence, as when a man grants a mortgage, by way of security for endorsements, whieh another promises to make for him.” And the next artiele declares, that “ the right of mortgage in this ease, shall only bo realized in so far as the promise shall be carried into effect by the person making it. The fulfilment of the promise, however, shall impart to the mortgage a retrospective effect to the time of the contract.” Thus if this contract was a mortgage in form, no possible objection could be made to its validity. But it is said that it is neither a mortgage nor a sale. This objection is extremely teehnleal. The intention of the contracting parties evidently was, to give a security for the endorsements which were to be given. It is generally immaterial, in what shape or form a contract is moulded, provided the object to be obtained be honest and legal. The exceptions to this general rale are few, and are confined to that class of contracts in which the form is considered as constituting an essential part of the contract itself, such as donations inter vivos, &e. This court lately decided, that the sale of real property to secure an endorser or security, was valid, not as a sale, but as a mortgage in disguise. So it has repeatedly been held by this court, and in France, that even a donation might be disguised under an onerous contract. Nay, in the ease of D’Or-genay et al. v. Droz, 13 La. 383, it was decided, that a sale for a fictitious price, although not binding on the parties as sueh, still would be valid as a donation, if it contained nothing contrary to public order ; provided the purchaser can receive a donation from the vendor, and no injury results to third persons. Here then the great principle whieh I invoke is fully recognized, that the intention of parties to contract, will not be defeated on mere technical objections as to the form of the act. Another rale of interpretation is, that an instrument should always be rather so construed, as to produce a legal effect, than to make it nugatory and inoperative. According to these legal principles, the transfer of Barrett’s rights to the proceeds of the property in question to Peyroux, should be so interpreted as to carry into effect the intention of the parties.

Re-hearing refused.